STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO. CV-09-15



ANDREW MENARD,

        Plaintiff
                                                    ORDER


v.


MAINE HANDICAPPED SKIING,

        Defendant.

## DECISION AND ORDER


This matter comes before the court on a motion for summary judgment by the

Defendant, Maine Handicapped Skiing.

### FACTUAL BACKGROUND

The central facts necessary to decide this motion are not in dispute. Defendant

Maine Handicapped Skiing ("MHS") is a nonprofit organization that provides adaptive

recreational sports activities to handicapped individuals. Plaintiff Andrew Menard

("Menard") applied to volunteer with MHS at the Sunday River Ski Resort. Prior to

volunteering, Menard was required to complete paperwork, including a form titled

"2006/2007 Express Acceptance of Risks, Release, Indemnification & Forum Selection

Agreement,"[1] as well as a "Maine Handicapped Skiing Insurance Waiver and Release of

Liability"[2] ("Waiver and Release").

---

[1] The Indemnification Form states:
> WARNING: All forms of alpine activities such as skiing, and snowboarding, including the use of lifts, are hazardous. Falls and injuries are a common occurrence therefore requiring the deliberate and conscious control of your body

Menard indicated on his application that he was an intermediate skier who had taken skiing lessons. However, Menard admitted to only taking one skiing lesson, and he is unsure whether it was before or after he signed the application. Menard knew that MHS relied on the information he provided on his application form.

MHS provided Menard with three days of training consisting of both indoor, classroom-type instruction, as well as some outdoor hands-on type instruction. After his training Menard began working with handicapped skiers. At all times there were other MHS volunteers assisting Menard.

---

through proper use of alpine equipment in relation to ever-changing variables and dangers. Safety is directly affected by your judgment in the severe elements of rough, high mountain forest terrain. Participate in alpine activities only within your ability level . . . . I freely and voluntarily accept all risk of injury, death or property damage occurring thereon from the inherent risks such as those listed above or those that can reasonably be inferred therefrom . . . . I accept for myself the full responsibility for any and all such damage or injury of any kind that may result from my actions.

The court notes that the validity of the Indemnification is not an issue in this case.

[2] The Waiver and Release States:

In consideration of being allowed to participate in any way in [MHS] programs, relate events, and activities, I . . . .

1. Agree that prior to participating, I will inspect . . . the facilities and equipment to be used, and if I believe to the best of my ability that anything is unsafe, I . . . will immediately advise [MHS] of such condition(s) and refuse to participate.

2. Acknowledge and fully understand that I . . . will be engaging in activities that involve risk of serious injury, including permanent disability and death, and severe social and economic losses which might result only from my own action, inactions or negligence of others, the rules of play, or the condition of the premises or any equipment used. Further, that there may be other risks not known to me or not reasonably foreseeable at this time.

3. Assume all the foregoing risks and accept personal responsibility for the damages following such injury, permanent disability or death.

4. Release, waive, discharge and covenant not to sue [MHS] . . . hereinafter refereed to as "releasees", from demands, losses or damages on account of injury, including death or damage to property, caused or alleged to be caused in whole or in part by the negligence of the releasees or otherwise.

I/WE HAVE READ THE ABOVE WAIVER AND RELEASE, UNDERSTAND THAT I/WE HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, HAVE NOT CHANGED IT ORALLY, AND SIGN IT VOLUNTARILY.

On his third day of working with handicapped skiers, MHS assigned Menard to work as part of a group of four people assisting a skier with a bi-ski, a device with parallel skis attached to a seat for handicapped skiers. He initially objected to working with the bi-ski, but eventually acquiesced and joined the group. During the first two uneventful runs down the mountain one member of the group held onto the bi-ski tethers while Menard and the other two volunteers skied around the tethered skier. On the third run down the mountain Menard held on to the tethers. On the fourth run down the mountain Menard, again holding onto the tethers for the bi-ski, fell trying to guide the bi-ski and sustained the injuries that are the basis of this action.[3]

Menard has sued MHS for negligence. He alleges that MHS breached its duty of care by failing to adequately train him, failing to provide him with proper equipment, and the failure to warn him of the potential dangers, all of which he claims caused his resulting injuries.

Menard's negligence suit may proceed only if the Waiver and Release he signed, absolving MHS of liability, is deemed invalid. Menard acknowledges that he did in fact sign the Waiver and Release, but alleges that he was never told of his bi-ski responsibilities. He contends that this was a misrepresentation by MHS regarding the risks and hazards of volunteering that renders the Waiver and Release invalid. (PRSMF ¶ 7; PASMF ¶¶ 1, 15.) Menard also alleges that MHS was negligent in not training him to operate a bi-ski prior to the incident, and that this negligence caused his injuries. (PASMF ¶¶ 2, 3, 6.)[4]

---

[3] There is a factual dispute as to whether Menard was holding on to the tethers, or whether they were wrapped around his wrists during the third and fourth runs. (DSMF ¶ 16; PRSMF ¶ 16.)
[4] Menard also states that, despite indicating intermediate on the application form, he was not an intermediate skier and MHS knew this by observing him ski. (PRSMF ¶ 8.)

3

MHS contends that the Waiver and Release is valid as Menard was capable of reading and understanding the form, thus it bars Menard's negligence claim. MHS further alleges that Menard was adequately trained through his assignment to a group with experienced volunteers, and through his observations of other members of the group tethered to the bi-ski for two runs prior to his taking the tethers. MHS further states that if Menard was uncomfortable with the bi-ski then he had a duty to let MHS know.[5] (DSMF ¶¶ 2-3; DRSMF ¶ 15.)

## PROCEDURAL HISTORY

On or about January 9, 2009, Menard filed a civil action against MHS, asserting a claim of negligence for failure to provide adequate training and instruction, failure to warn of potential dangers, and failure to provide proper equipment. On January 14, 2009, MHS filed an answer denying liability on all counts, which was subsequently followed by an amended answer, filed on February 3, 2009. On June 30, 2009, MHS filed an unopposed motion for a stay of proceedings, which the court granted in an Order dated July 8, 2009. On or about July 23, 2009, MHS filed a motion for summary judgment accompanied by statements of material fact ("DSMF"). Menard filed a motion to extend the deadline to oppose summary judgment, which this court granted in an Order dated August 7, 2009. On August 19, 2009, Menard filed an opposition to the motion for summary judgment, response to defendant's statements of material fact ("PRSMF"), and additional statements of material fact ("PASMF"). MHS filed a motion to extend the deadline to reply to the opposition, which this court granted in an Order dated August 25,

---

[5] The language of the Waiver and Release states that "prior to participating, I will inspect . . . the facilities and equipment to be used, and if I believe to the best of my ability that anything is unsafe, I . . . will immediately advise [MHS] of such condition(s) and refuse to participate."

4

2009. On September 8, 2009 MHS filed a reply to Menard's opposition along with a reply statement of material fact ("DRSMF").

DISCUSSION

## I.     Standard of Review.

"Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute." *Blue Star Corp. v. CKF Props. LLC*, 2009 ME 101, ¶ 23, __A.2d __ (citing *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825; *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174); *see also* M. R. Civ. P. 56. A party wishing to avoid summary judgment must present a prima facie case for the claim or defense that is asserted. *Reliance National Indemnity v. Knowles Industrial Services*, 2005 ME 29, ¶ 9, 868 A.2d 220, 224-25. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 21-22.

## II.     Waiver and Release Validity

MHS has moved for summary judgment, arguing that there are no material facts in dispute regarding the incident in question or the validity of the Waiver and Release, thus the remaining issues are only matters of law to be resolved by the court. As the Waiver and Release, if valid, bars Menard's negligence suit, in order for him to survive

5

MHS's motion for summary judgment, he must demonstrate that the record contains disputed issues of fact regarding the validity of the Waiver and Release.

The Law Court addressed the validity of releases in *Lloyd v. Sugarloaf Mountain Corp.*, 2003 ME 117, 833 A.2d 1. The plaintiff in *Lloyd* was injured in a bicycle accident that occurred while participating in a NORBA sponsored bike challenge at Sugarloaf Mountain. Lloyd sued both NORBA and Sugarloaf alleging negligence, and argued that the releases he signed did not effectively discharge the defendants from liability because they were ambiguous, vague, and contrary to public policy. The Court held that the releases were valid, despite the provisions that absolved the defendants from liability for their own negligence, as they "'expressly spell[ed] out with the greatest particularity the intention of the parties contractually to extinguish negligence liability." *Id.* ¶ 8, 833 A.2d at 4 (citing *Doyle v. Bowdoin Coll.*, 403 A.2d 1206, 1208 (Me. 1979)). The Court noted the "specific reference in the membership release to the negligence of the parties seeking immunity" was a sufficient establishment of the parties' intent to extinguish the defendants' liability. *Id.* The Law Court also held that "releases saving a party from damages due to that party's own negligence are not against public policy." *Lloyd*, 2003 ME 117, ¶¶ 10-12, 833 A.2d 1, 4-5 (noting that not only does Maine precedent state that releases such as these "are not violative of public policy," but the bicycle race was not a public service, nor were its entrants "under any compulsion to sign the release").

To discern the intent of MHS and Menard and the validity of the Waiver and Release, its plain language must be examined. The pertinent provisions of the Waiver and Release state:

> In consideration of being allowed to participate in any way in [MHS]
> programs, related events, and activities, I . . . .

6

1. Agree that prior to participating, I will inspect . . . the facilities and equipment to be used, and if I believe to the best of my ability that anything is unsafe, I . . . will immediately advise [MHS] of such condition(s) and refuse to participate.

2. Acknowledge and fully understand that I . . . will be engaging in activities that involve risk of serious injury, including permanent disability and death, and severe social and economic losses which might result only from my own actions, inactions or negligence of others, the rules of play, or the condition of the premises or any equipment used. Further, that there may be other risks not known to me or not reasonably foreseeable at this time.

3. Assume all the foregoing risks and accept personal responsibility for the damages following such injury, permanent disability or death.

4. *Release, waive, discharge and covenant not to sue [MHS] . . . hereinafter refereed to as "releasees", from demands, losses or damages on account of injury, including death or damage to property, caused or alleged to be caused in whole or in part by the negligence of the releasees or otherwise.*

(DSMF, Ex 2.) (emphasis added).

According to the Waiver and Release, Menard acknowledged that he would be engaging in activities that contained a risk of injury, some of which were "not known to [him] or not reasonably foreseeable" at the time of signing the Waiver and Release. Menard also acknowledged, by signing the Waiver and Release, that he could not recover for any injuries "caused or alleged to be caused in whole or in part by the negligence" of MHS. This specific reference in the Waiver and Release that MHS is released from negligence liability for injuries is virtually identical to the release in *Lloyd.* This sufficiently establishes the parties' intent to extinguish MHS's liability as, even when strictly construed against MHS, the Waiver and Release clearly states with "the greatest particularity the intention of the parties contractually to extinguish negligence liability." *See Hardy v. St. Clair,* 1999 ME 142, ¶ 6, 739 A.2d 368, 370 (citing *Doyle v. Bowdoin Coll.,* 403 A.2d 1206, 1207 (Me. 1979)).

7

Further, the court is not convinced by the variety of theories Menard brings forth to disclaim the validity of the waiver.

Menard cites to 32 M.R.S.A. § 15217(1)(A), defining the inherent risks of skiing, as evidence that the Waiver and Release is invalid because the use of a bi-ski is not contained within the statute.[6] However, the Waiver and Release uses broad language that states volunteers engage "in activities that involve risk of injury . . . which might result only from [volunteers] own actions, inactions or negligence of others, the rules of play, or the condition of the premises or any equipment used." This broad language encompasses all of the MHS activities that involve risk, not just the inherent risks of skiing.[7] As such, Menard's claim that the statute renders the Waiver and Release invalid fails.

Menard next argues that MHS made an "implicit or explicit promise to adequately train" him, and that the failure to do so was a breach of contract, rendering the Waiver

---

[6] The statute states that skiers' and tramway passengers' responsibilities include:
"Inherent risks of skiing" means those dangers or conditions that are an integral part of the sport of skiing, including, but not limited to: existing and changing weather conditions; existing and changing snow conditions, such as ice, hardpack, powder, packed powder, slush and granular, corn, crust, cut-up and machine-made snow; surface or subsurface conditions, such as dirt, grass, bare spots, forest growth, rocks, stumps, trees and other natural objects and collisions with or falls resulting from such natural objects; lift towers, lights, signs, posts, fences, mazes or enclosures, hydrants, water or air pipes, snowmaking and snow-grooming equipment, marked or lit trail maintenance vehicles and snowmobiles, and other man-made structures or objects and their components, and collisions with or falls resulting from such man-made objects; variations in steepness or terrain, whether natural or as a result of slope design; snowmaking or snow-grooming operations, including, but not limited to, freestyle terrain, jumps, roads and catwalks or other terrain modifications; the presence of and collisions with other skiers; the failure of skiers to ski safely, in control or within their own abilities.
32 M.R.S.A § 15217(1)(A) (2009).
[7] The court also notes that Menard failed to address how the statute applies to risks associated with being an MHS volunteer as the statute falls under the "Board of Elevator and Tramway Safety" portion of the code, with the primary purpose to "protect its citizens and visitors from unnecessary mechanical hazards in the operations of elevators and tramways." 32 M.R.S.A. § 15201. Further, the specific section Menard cites to also references the duty of the skier to ski within the limits of the skier's own ability. Therefore, even if this statute did apply to MHS volunteer activities Menard would still have a duty to only participate within his own ability level. 32 M.R.S.A § 15217(4).

8

and Release unenforceable. (Pl.'s Opp'n to Def's Mot. Summ. J. at 4.) However, Menard does not cite any facts or any language in the Waiver and Release that supports this contention. As such, Menard's breach of contract claim fails.

The court also disagrees with Menard's contention that there was no consideration in exchange for signing the release. "Consideration can either be a benefit to the promisor or a detriment to or forbearance by the promisee." *See Kennebunk Sav. Bank v. West*, 538 A.2d 303, 304 (Me. 1988); *see also* BLACK'S LAW DICTIONARY 300 (7th ed. 1979) (consideration defined as "something of value (such as an act, a forbearance, or a return promise) received by a promisor from a return promisee"). The consideration provided to Menard in return for signing the Waiver and Release is clearly stated in the first sentence: "In consideration of being allowed to participate in any way in [MHS] program . . . ." Therefore, the court finds that the Waiver and Release was supported by adequate consideration—the benefit of participating in the MHS programs.

Lastly, Menard argues that the Waiver and Release is ambiguous and violates public policy. As was addressed above, the court does not find the Waiver and Release ambiguous, rather that it expressly states the intention of the parties to contractually extinguish MHS's liability. Further, "releases saving a party from damages due to that party's own negligence are not against public policy." *Lloyd v. Sugarloaf Mountain Corp.*, 2003 ME 117, ¶ 10, 833 A.2d 1, 4 (citing *Hardy*, 1999 ME 142, ¶ 3 n.1, 739 A.2d at 369; *Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 993 (Me. 1983)). Although some jurisdictions hold that similar releases are void for public policy, this is not the law in Maine.[8] *See id.* ¶ 11-12, 833 A.2d at 4-5 (noting that where entrants are not "under any

---

[8] Menard cites to the Connecticut opinion, *Hanks v. Power Ridge Restaurant*, in support of the argument that the Waiver and Release violates public policy. The court notes that the dissenting

9

compulsion to sign the release" the Court "would be hard-pressed" "to overturn []

previous decisions" holding that releases such as these are not void for public policy).

The court need not address MHS's claim that Menard is equitably estopped from

bringing suit as the Waiver and Release is valid, therefore barring Menard's action.

## CONCLUSION

In light of the express language of the Waiver and Release, the court concludes

that Menard's negligence claim is barred, as such MHS's motion for summary judgment

is therefore GRANTED. The clerk shall incorporate this Order into the docket by

reference pursuant to M.R. Civ. P. 79(a).

DATED: November 4, 2009

Joyce A. Wheeler, Justice

---

opinion disagrees with the majority and cites to over 25 cases, one of which is the Maine case *Lloyd v. Sugarloaf Mountain Corp.*, 2003 ME 117, 833 A.2d 1.

> In sum, . . . the defendants' release at issue in this case does not violate public policy with respect to the sport of snowtubing. This conclusion is consistent with the vast majority of sister state authority, which upholds releases of liability in a variety of recreational or athletic settings that are akin to snowtubing as not violative of public policy. . . . This near unanimity among the courts of the various states reflects the fact that most, if not all, recreational activities are voluntary acts. Individuals participate in them for a variety of reasons, including to exercise, to experience a rush of adrenaline, and to engage their competitive nature. These activities, while surely increasing one's enjoyment of life, cannot be considered so essential as to override the ability of two parties to contract about the allocation of the risks involved in the provision of such activity. When deciding to engage in a recreational activity, participants have the ability to weigh their desire to participate against their willingness to sign a contract containing an exculpatory clause. It also is consistent with the view of the American Law Institute, as embodied in 2 RESTATEMENT (SECOND) OF CONTRACTS § 195 (1981), and RESTATEMENT (THIRD) OF TORTS, APPORTIONMENT OF LIABILITY 2 (2000).

276 Conn. 314, 347 (Conn. 2005) (Norcott, J., dissenting) (internal citations and quotations omitted).

10

ANDREW MENARD VS MAINE HANDICAPPED SKIING
UTN:AOCSsr  -2009-0002650                     CASE #:PORSC-CV-2009-00015
-----------------------------------------------------------------------------
SEL VD                                 REPRESENTATION TYPE        DATE
01 0000007300 ATTORNEY:CLIFFORD, PETER
ADDR:56 PORTLAND ROAD KENNEBUNK ME 04043
     F FOR:ANDREW MENARD                       PL         RTND   01/09/2009


02 0000008188 ATTORNEY:EISENBERG, CAROL
ADDR:465 CONGRESS STREET PO BOX 9545 PORTLAND ME 04112-9545
     F FOR:MAINE HANDICAPPED SKIING            DEF        RTND   01/14/2009


03 0000000120 ATTORNEY:LARGE, WENDELL
ADDR:465 CONGRESS STREET PO BOX 9545 PORTLAND ME 04112-9545
     F FOR:MAINE HANDICAPPED SKIING            DEF        RTND   01/14/2009




Select A=Atty, B=Bail, D=DckPr, E=Evt, F=Fin, J=Jdgm, O=Ordr, P=Prty, R=Review:

To exit this option, select the EXIT KEY.